UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL J. O'BRIEN

      Plaintiff                    Civil Action No. 18-11546

v.                             HON.  DAVID M. LAWSON
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Daniel J. O'Brien ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment [Docket #13] be GRANTED and that Plaintiff's motion for summary judgment [Docket #10] be DENIED.

## I.  PROCEDURAL HISTORY

      On February 17, 2015, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability as of April 9, 2009 (Tr. 151).  After the initial denial of the claim,

he requested an administrative hearing, held on April 4, 2017 in Lansing, Michigan before Administrative Law Judge ("ALJ") Lawrence E. Blatnik (Tr. 29). Plaintiff, represented by attorney Randall Phillips, testified (Tr. 33-55), as did Vocational Expert ("VE") Norman Abeles (Tr. 56-64). On May 24, 2017, ALJ Blatnik found that Plaintiff was capable of performing his past relevant work as a shipping and receiving clerk, assembler, and inspector (Tr. 16-24). On March 23, 2018, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on May 17, 2018.

## II. BACKGROUND FACTS

Plaintiff, born January 22, 1959, was 58 when ALJ Blatnik issued his decision (Tr. 24, 151). He completed high school and worked previously as a shipping and receiving agent (Tr. 169). He alleges disability as a result of sciatica, Barrett's esophagus, ulcers of the esophagus, bilateral knee pain, depression, ankylosing spondylitis, right hand swelling, and neck, arm and hand pain and numbness (Tr. 168).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

He lived in Pickney, Michigan with his 24-year-old son (Tr. 33). He was separated from his wife (Tr. 33). His son was an aide for Plaintiff's wife who had Parkinson's Disease (Tr. 34). Plaintiff stood 5' 10" and weighed 178 pounds (Tr. 33). He currently received a pension of approximately $35,000 with medical insurance from General Motors ("GM") (Tr. 33).

Plaintiff held a current driver's license and drove around five times a week (Tr. 34). His vocational training was limited to some "on-premises" classes offered by GM (Tr. 35). He worked as a shipper and receiver until his plant was shut down in April, 2009 (Tr. 36). His work required him to work on "a short assembly line" with four other people (Tr. 36). He was not required to lift more that two-and-a-half pounds (Tr. 36).  Within the past 15 years he also worked as an inspector (auditor), which involved inspecting work procedures and parts (Tr. 37).  Since his job a GM ended, he worked for approximately three months in 2012 for a plastics company helping them "organize some books for auditing" (Tr. 39).  He also performed temporary work for an electrical box company and driving vehicles for a dealership (Tr. 39).

Plaintiff was unable to work due to "back and knee issues" and sleep apnea (Tr. 40). He required arthroscopic surgery on the left knee (Tr. 41).  He experienced thoracic spine pain while sitting (Tr. 41).  He took pain medication but had cut back on his previous narcotics use (Tr. 41).  He did not experience medication side effects (Tr. 42).  He was unable to walk for even half an hour and was limited to standing or sitting for around 20 minutes (Tr. 42).  His most comfortable position was sitting on a couch with his legs elevated (Tr. 42).  He was able to lift 20 pounds (Tr. 43).  He experienced difficulty grasping objects due to arthritis and swelling of the right hand (Tr. 43).  He did not smoke or use alcohol (Tr. 43).  He had not used marijuana in the past seven years (Tr. 44).

Plaintiff sought mental health treatment after contemplating suicide around 17 months

before the hearing but had not received treatment in the past nine months (Tr. 44). He denied current suicidal ideation (Tr. 45). He was able to care for his personal needs and was able to shower due to a device he had created to allow him to enter the shower without difficulty (Tr. 45). He shared the cooking and laundry chores with his son but did not perform yard chores (Tr. 46). He made one major shopping trip each month and a number of smaller trips (Tr. 46). He had internet service but had little knowledge of computers (Tr. 46-47). In the past year, he had taken a couple of car trips to Colorado to help his daughter move (Tr. 47).

Plaintiff opined that he would be unable to perform his past work as an inspector/auditor due to the amount of walking required and his inability to get a good night's sleep (Tr. 48). In response to questioning by his attorney, Plaintiff reported that he took a one to two-hour "power nap" each afternoon (Tr. 49). He spent around six hours of every day sitting on a couch with his feet propped up (Tr. 50). His performed his most recent work at GM with "restrictions" due to cervical spine injuries due to a fall and a car accident (Tr. 50). His restrictions included no repetitive reaching at or above shoulder level or lifting more than 12 pounds (Tr. 51). He experienced a right hand tremor that affected his ability to "hold and grasp" (Tr. 51). His back and shoulder pain averaged a seven to seven-and-a-half on a scale of one to ten (Tr. 52). He experienced difficulty using stairs, bending, and stooping due to left knee pain (Tr. 52). He also experienced numbness of the right foot (Tr. 52). He used a cane "a little bit in the wintertime" for balance (Tr. 52). On some days, he

declined to bathe or shave (Tr. 53).  His memory was "bad" (Tr. 53).  He experienced pain upon changing from a sitting to standing position (Tr. 53).  He would require a job that allowed him to walk periodically (Tr. 54).  He experience problems with all repetitive reaching (Tr. 54).  Aside from the former suicidal ideation, he experienced guilt due to his inability to take care of his family (Tr. 54).  He played baseball and college hockey  in his youth (Tr. 54).  He had been given a knee brace by his doctor for use while playing golf but had not used it (Tr. 55).

### B.    Medical Evidence[1]

### 1.  Treating Sources

June, 2008 records by Laran J. Lerner, D.O. include prescriptions for Motrin 800, Flexeril, and Zoloft (Tr. 337).  Records from the following month show that he was prescribed Robaxin and Ultram (Tr. 335). July, 2008 records note that he experienced an injury while golfing (Tr. 331).  October, 2008 records by Dr. Lerner note "opiate dependency" (Tr. 323).

May, 2009 records by Dr. Lerner note a prescription for Suboxone with a history of opiate dependency (Tr. 306-307).   July, 2009 EMG studies of the lower extremities showed "[n]o evidence of lumbosacral radiculopathy or neuropathy of the lower extremities (Tr. 296, 299).  The same month, Plaintiff reported that he injured himself while power-washing on

---

[1]Records pertaining to Plaintiff's condition prior to the alleged onset of disability date of April 9, 2009 and after September 30, 2015 are included for background purposes only.

a ladder (Tr. 295).  The following month, Plaintiff reported a 60 percent reduction in pain

with medication (Tr. 293).  He reported that he coped with pain by elevating his legs and

lying flat (Tr. 294).  EMG studies of the upper extremities were unremarkable (Tr. 291-292).

Dr. Lerner's records from September, 2009 note Plaintiff's report of neck and left

shoulder and arm pain (Tr. 378).  He reported "stress, anxiety and depression" due to an

impending divorce (Tr. 378).  Plaintiff demonstrated a decreased range of cervical spine

motion with muscle spasms but a normal range of lumbar spine motion (Tr. 378).  The

following month, he complained of low back pain radiating into his left leg (Tr. 375).

Plaintiff sought treatment for left elbow swelling after hitting another hockey player in the

face mask with his elbow (Tr. 373).

In January, 2010, Plaintiff reported right hand swelling and a fractured finger after

being involved in an "altercation" (Tr. 368).  In March, 2010, Plaintiff exhibited continued

hand swelling; a decreased range of cervical and lumbar spine motion; and an antalgic gait

(Tr. 365).  In September, 2010, Plaintiff reported fatigue, headaches, stress, anxiety, and

depression (Tr. 360).  He denied opiate use but acknowledged "opiate urges" (Tr. 360).  A

biopsy of the stomach showed mild gastropathy (Tr. 456).

The same month, Plaintiff underwent gastrointestinal track surgery (Tr. 357).  In

December, 2010, Dr. Lerner found that Plaintiff was "disabled from gainful employment due

to cervical radiculopathy and myositis, sciatica, fractured cervical vertebrae, fractured left

elbow, internal derangement of the right knee, gait disturbance, left shoulder adhesive

-6-

capsulitis and tendonitis, stress/anxiety, depression, migraines, hypertension, insomnia, left elbow bursitis, right hand and wrist tendinitis, a fractured finger of the right hand, and fibromyalgia (Tr. 356).

January, 2011 records from Community Orthopedic Surgery note that Plaintiff's January, 2010 hand injury was exacerbated by the underlying condition of arthritis (Tr. 484). Plaintiff reported improvement in the condition with medication (Tr. 484). In July, 2011, Plaintiff sought treatment after stepping on a nail with his left foot (Tr. 425).

In September, 2012, Dr. Lerner noted that Plaintiff had been taking Vicodin every day and had "opiate dependence" (Tr. 350). Treating records note Plaintiff's report of neck, back, right hand, and knee pain (Tr. 344). January, 2013 imaging studies showed gastroesophageal reflux ("GERD") and mild dysphagia (Tr. 389). May, 2013 treating records note Plaintiff's report of bilateral knee pain and sleep apnea (Tr. 416). August, 2014 records by John A. Rosella, D.O. state that Plaintiff wanted to "discuss disability" (Tr. 407).

In January, 2015, Dr. Rosella noted Plaintiff's report of weakness, numbness, and gait problems (Tr. 395). A January, 2015 MRI of the lumbar spine showed mild facet arthropathy at L1-L2 and L2-L3 (Tr. 391). The MRI showed mild stenosis at L3-L4, mild facet facet arthropathy and stenosis at L4-L5, and at L5-S1, a disc osteophyte complex contact with the L5 nerve root with moderate bilateral stenosis (Tr. 392). A May, 2015 MRI of the lumbar spine showed moderate foraminal stenosis at C3-C4, mild to moderate faraminal narrowing at C4-C5, and moderately severe bilateral foraminal stenosis at C6-C7 (Tr. 467).

June, 2015 records by Tri-County Pain Consultants note Plaintiff's report of intermittent weakness and numbness of the right leg (Tr. 474). He stated that was currently working as a "clean-up man" at a kitchen and bath store (Tr. 490). He reported level "six" pain which was worsened by temperature extremes and physical activity (Tr. 474). He exhibited normal muscle tone and gait (Tr. 475, 617). An epidural steroid injection was administered without complications (Tr. 476, 618). The following month, Plaintiff reported initially good results followed by a partial return of pain (Tr. 485). Plaintiff reported that he took Aleve the day before after installing carpet (Tr. 485). Plaintiff underwent additional epidural injections (Tr. 489). November, 2015 treating records note Plaintiff's reported that he felt like food was "getting stuck" in his esophagus (Tr. 512).

February, 2016 imaging studies of the left knee were unremarkable (Tr. 636). The following month, Plaintiff requested a prescription for Norco after hurting his back shoveling snow (Tr. 589). In April, 2016, Plaintiff reported worsening knee pain over the past three months but demonstrated 5/5 knee strength (Tr. 477, 581). A steroid injection was administered without complications (Tr. 479). Imaging studies of the left knee were negative for abnormalities (Tr. 482). The same month, mental health counselor Theresa Callard-Moore, M.M.S.W. noted Plaintiff's reported stress as a result of his estranged wife's overspending (Tr. 537). He stated that he was involved in a fight five years earlier where he broke his hand (Tr. 537). In May, 2016 he reported financial stressors, "extreme pain," and the inability to sleep (Tr. 534). Plaintiff sought treatment for renewed knee pain, noting that

he was "doing fairly well" until he injured his knee playing golf (Tr. 524, 550).  He was given a script for a knee brace (Tr. 525).  He reported to Dr. Rosella that family relationships had improved (Tr. 578).

In July, 2016, Callard-Moore found that Plaintiff was unable to meet competitive standards in social functioning, activities of daily living, concentration, persistence, or pace, performing simple tasks, using judgment, or sustaining concentration or attention (Tr. 527-528).  She found he was seriously limited in performing repetitive tasks, working within a time-frame, and working with others (Tr. 528).  She found that he was unable to meet competitive standards in responding appropriately to usual or changing work routines or responding appropriately to work pressures (Tr. 529).  She found that he was seriously limited in the ability to work within a schedule and without psychologically based interruption and that his psychological impairments would result in him being off task over 20 percent of the workday (Tr. 530).

### 2. Non-Treating Sources

In June, 2015, John E. Jeter, M.A. performed a performed a consultative psychological examination on behalf of the SSA, noting appropriate grooming and a slight limp (Tr. 469).  Plaintiff reported that his last mental health treatment was four years earlier (Tr. 469).  Plaintiff reported that he was compliant with prescribed medication and that its effectiveness was "good" (Tr. 470).  Plaintiff reported sleeping eight-and-a-half hours each night with sleep disturbances due to sleep apnea (Tr. 470).  He denied taking naps and had

a "good" appetite (Tr. 470). He was able to shop but current interests included only television, one friend, and interacting with his brother (Tr. 470). He reported that he currently worked between 10 and 15 hours a week doing "clean up" (Tr. 470). Jeter noted that Plaintiff was cooperative and responded to instructions well (Tr. 471). He denied suicidal or homicidal ideations (Tr. 471). He appeared fully oriented and exhibited a normal memory (Tr. 472). Jeter found "no difficulty" in the ability to comprehend and carry out simple or complex tasks (Tr. 473). Plaintiff was given a guarded prognosis due to depression and reports of pain (Tr. 473).

In July, 2015, William Schirado Ph.D. performed a non-examining review of the existing records on behalf of the SSA, noting a possible history of affective and substance addiction disorders (Tr. 74). He found only mild psychological limitation, noting that Plaintiff had previously refused to take a consultative examination scheduled by the SSA (Tr. 75).

## C. Vocational Expert Testimony

Citing the *Dictionary of Occupational Titles* ("*DOT*"), VE Norman Abeles classified Plaintiff's former work as a shipping/receiving clerk as semiskilled and exertionally light; and jobs as an assembler and inspector, unskilled/light[2] (Tr. 57). The ALJ then posed the

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that

following question to the VE, describing a hypothetical individual:

> [A]n individual that could lift and carry 50 pounds occasionally, 25 pounds frequently.  Could sit, stand, or walk all for at least six hours in an eight hour workday.  Could push and pull the same amount as he could lift or carry.  He would be limited to only occasional overhead reaching with the upper extremities.  He could do frequent handling or fingering with the right dominant hand.  No climbing of ladders, ropes or scaffolds.  Occasional climbing of ramps or stairs.  Would an individual with those restrictions be able to do [] any of the past work? (Tr. 58).

The VE testified that if the above-stated restrictions would allow for all of Plaintiff's past relevant work (Tr. 58).  He testified further that the restrictions would also allow for the unskilled, exertionally medium jobs of cleaner (Tr. 150,000 positions in the national economy); kitchen helper (120,000); and packer (80,000) (Tr. 59).

The VE testified that if the above described individual were limited to 20 pounds lifting occasionally and 10 frequently (exertionally light work), Plaintiff's past relevant work would still be available (Tr. 59).  He stated that the limitation to light work would also allow for the unskilled work of an office helper (150,000); merchandise marker (100,000); and ticket seller (80,000) (Tr. 60).   The VE stated that if the same individual were also limited to work allowing for a sit/stand option every 30 to 45 minutes, he could perform approximately half of the former positions of shipping/receiving clerk, assembler and inspector (Tr. 61).  He found that the positions of office helper, merchandise marker, and ticket seller would be reduced by 25 percent (Tr. 61).  He testified that the need to be off task

---

exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

for more than 10 percent of the workday, or, the need to miss more than one day of work each month would eliminate all unskilled work (Tr. 62). He stated that his testimony regarding work breaks and absenteeism was based on his own professional experience (Tr. 62).

In response to questioning by Plaintiff's attorney, the VE stated that the inability to use the right hand more than occasionally would preclude all of the past work and the other jobs listed in the vocational testimony (Tr. 63). The VE stated that the need to take a 60-minute break or take other breaks exceeding 10 percent of the workday would preclude all work (Tr. 64). The VE testified that the need to elevate the legs to heart level during the course of the workday would also preclude all work (Tr. 64).

### D. The ALJ's Decision

Citing the medical records the ALJ found that Plaintiff experienced the severe impairments of "degenerative joint disease/meniscal tear of the left knee and degenerative disc disease of the cervical and lumbar spine" but that none of the conditions met or medically equaled the impairments found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 18, 20). He found that the conditions of dysthymic disorder and history of substance abuse were non-severe (Tr. 18). As to the mental impairments, the ALJ found that Claimant experienced mild limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and in adapting or managing himself (Tr. 19). The ALJ found that for the period between April 9, 2009 and the

date last insured for DIB of September 30, 2015, Claimant retained the Residual Functional

Capacity ("RFC") for light work with the following additional restrictions:

> [He] was able to sit for six hours, stand for six hours, and walk for six hours.
> He could occasionally reach overhead with either upper extremity. The
> claimant could frequently handle and finger with the right hand. He was able
> to climb ramps and stairs occasionally, but never climb ladders, ropes, or
> scaffolds (Tr. 21).

Citing the VE's job findings, the ALJ determined that Plaintiff could perform his past

relevant work as a shipping and receiving clerk, assembler, and inspector (Tr. 23, 58).

The ALJ found that Plaintiff's allegations of limitation for the relevant period were

"not entirely consistent with the medical evidence and other evidence in the record . . ." (Tr.

21). The ALJ noted that Plaintiff experienced relief from back pain with epidural injections

(Tr. 22). He noted that imaging studies of the knees showed only minimal abnormalities (Tr.

22). The ALJ noted that despite the allegations of back pain, Plaintiff was able to take a

three-day golf outing, drive to Colorado and back, and install carpeting (Tr. 22). The ALJ

noted that Plaintiff experienced right hand swelling after playing hockey which was relieved

with anti-inflammatory medication (Tr. 22). He accorded "great weight to psychologist

Jeter's finding that Plaintiff had no difficulty "comprehending and carrying out simple

directions, carrying out complex tasks and performing repetitive, routine simple tasks . . ."

(Tr. 23). In contrast, he accorded "little weight " to therapist Callard-Moore's opinion that

Plaintiff was "either seriously limited or [] unable to meet competitive standards in all areas

of mental functioning" (Tr. 23). He noted that Plaintiff's ability to work part-time and make

long car trips undermined her assessment and that she had "only a short treatment relationship with [Plaintiff]" (Tr. 23).

## III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Claimant has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A. The Step Three Findings

In his first argument, Plaintiff disputes the finding that he did not meet or medically equal the requirements of Listing 1.04A.  *Plaintiff's Brief,* 14-19, *Docket #10,* Page ID 709. He notes that the Step Three finding that he did not medically equal Listing 1.04A  was not supported by the opinion of an acceptable medical source as required by SSR 96-6p. *Id.*  at 15.  He argues that the failure to support the  Step Three "equivalency" finding with an acceptable medical source opinion constitutes reversible error. *Id.*

-15-

At Step Three of the administrative sequence, "[a] Claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled [ ] and entitled to benefits." *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.' " *Id.* (citing 20 C.F.R. § 404.1525(a)). At Step Three, Plaintiff bears the burden of establishing that his impairments meet or medically equal a listed impairment. *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987).

## 1.  The Finding that Plaintiff Did Not Meet Listing 1.04A is Well Supported

For a disability finding under Listing 1.04A (Disorders of the Spine), a claimant must make a threshold showing of a spinal disorder such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[ ], resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."  To meet part A of the Listing, a claimant must also show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P,

Appendix 1 § 1.04A.

At Step Three, the ALJ found that Plaintiff did not meet or medically equal the requirements of 1.04A, noting that the records did not show either nerve root compromise characterized by neurological symptoms or positive straight-leg raising in both the sitting and supine positions (Tr. 20). My own review of the record shows that Plaintiff exhibited normal strength of the lower extremity and that EMGs of both the upper and lower extremities were negative for neurological abnormalities (Tr. 291, 292, 296, 299, 485, 597, ). Because Plaintiff cannot demonstrate that he met *all* the requirements of the Listing, the finding that he did not meet the Listing should remain undisturbed. *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986)(claimant must satisfy *all* of listing's criteria for a finding that s/he meets a listed impairment); *Houston v. Colvin*, 2017 WL 82976, at *2 (E.D. Mich. January 10, 2017)(Drain, J.)(same).

## 2. The Record Does Not Support an Equivalency Finding

In opposition to Plaintiff's argument that the absence of an equivalency opinion by an acceptable medical source requires a remand, Defendant cites SSR 17-2p, which states that an ALJ may find that a claimant does not medically equal a listed impairment without the support of a medical opinion. SSR 17-2p, 2017 WL 3928306, at *4 (March 27, 2017). However, in the present case, because Plaintiff filed his claim for benefits on February 17, 2015, SSR 96-6p is applicable. 1996 WL 374180, at *3 (July 2, 1996); Hearing and Appeals Law and Litigation Manual ("HALLEX") I-5-3-30, 2017 WL 1362776, at *5 (*last revised*

October 2, 2017)(prior rules to be employed for applications filed before March 27, 2017).

Under SSR 96–6p, Plaintiff is correct that generally, a Step Three finding that a claimant

does not medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

1 must be supported by a medical opinion.  SSR 96-6p at *3("longstanding policy requires

that the judgment of a physician (or psychologist) designated by the Commissioner on the

issue of equivalence . . . .").

Despite the absence of an acceptable medical opinion regarding equivalency, the

ALJ's finding that Plaintiff did not medically equal Listing 1.04A does not provide a basis

for remand.    Under § 404.1526, "an impairment is medically equivalent to a listed

impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any

listed impairment."    The regulation states in relevant part that a finding of medical

equivalence can be made where (b)(1) the claimant has an impairment found among the listed

impairments that (A-B) does not meet all of the requirements of the listing or, meets all of

the requirements but "one or more of the findings is not as severe as specified in the

particular listing;" provided that "other findings related to [the] impairment . . . are at least

of equal medical significance to the required criteria."

Plaintiff concedes that while the requirements of Listing 1.04A "may not have been

met," the Step Three finding that he did not medically equal the Listing cannot be sustained

without an opinion by an acceptable medical source.  *Plaintiff's Brief* at 16.  However, he

fails to argue, much less provide record support, that his impairments equal the medical

significance of the Listing requirements as required under  § 404.1526(b).  Instead, he contends that the Step Two finding that he experienced degenerative disc disease of the cervical and lumbar spine implies that the condition was serious enough to warrant an equivalency opinion at Step Three.

However, while the condition of degenerative disc disease passes the low threshold for inclusion at Step Two, it is a far cry from establishing that the condition met or medically equaled a listing.  "[T]he fact that the ALJ acknowledged the physical conditions at Step Two does not imply that the conditions were so pronounced as to meet or medically equal a listed impairment." *Bukowski v. Commissioner of Social Sec.*, 2014 WL 4798972, at *9 (E.D.Mich. August 4, 2014)(absence of an equivalency opinion at Step Three not fatal to administrative finding where the plaintiff failed to meet her burden to show that she medically equaled a listed impairment).  "An impairment should be omitted at Step Two *i.e.* deemed non-severe 'only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.' " *Id.* (*citing Farris v. Secretary v. HHS*, 773 F.2d 85, 89 (6th Cir.1985))(internal citations omitted).  Without more, Plaintiff's contention that an equivalency opinion was required at Step Three because the condition was found to be more than a "slight abnormality" at Step Two does not provide grounds for remand.  Where the claimant cannot make a reasonable showing that he medically equals a listed impairment, the failure to obtain an equivalency opinion does not constitute grounds

-19-

for remand. *See Smith   v. Commissioner of Social Security*, 2019 WL 3243768, at *5 (E.D.Mich., June 30, 2019)(Davis, M.J.)(*adopted,* 2019 WL 3239252 (E.D. Mich. July 18, 2019)(*citing Lusk v. Comm'r of Soc. Sec.*, 106 Fed. Appx. 405, 411 (6th Cir. 2004)).  "It is the claimant's burden at this third step in the sequential evaluation to bring forth evidence to establish that he or she meets or equals a listed impairment." *Retka v. Commissioner of Social Sec.*, 1995 WL 697215, at *2 (6ᵗʰ Cir. November 22,1995)(*citing Evans v. Secretary of Health and Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987)).

The *Smith* determination that the plaintiff did not make a plausible case for equivalency under Listing 1.04A is applicable here.  While an MRI of the lumbar spine showed that a disc osteophyte complex had "contact" with a nerve root at L5-S1,  EMGs of both the lower and upper extremities were negative for radiculopathy or neuropathy (Tr. 393).  The MRI of the cervical spine does not show any evidence of nerve root involvement (Tr. 467).  The wholly negative EMG studies of the upper and lower extremities stand at odds with a finding that he experienced significant neurological symptoms as would be required to meet or equal Listing 1.04A.  *Id.*

Moreover, Plaintiff's ability to engage in a number of strenuous activities during the relevant period grossly undermines his claim that he medically equaled Listing 1.04A. Records from one month after the alleged onset of disability date state that Plaintiff injured himself while power-washing on a ladder (Tr. 295).  In September, 2009, he demonstrated a normal range of lumbar spine motion (Tr. 378).  The following month, Plaintiff reported

a elbow injury while playing hockey (Tr. 373). In January, 2010, he injured his hand during a physical alteration (Tr. 368). June, 2015 records state that despite Plaintiff's claim of intermittent right leg weakness, he was able to work part-time as a "clean-up man" at a kitchen and bath store (Tr. 485). Notes from the following month state that he had recently installed carpet (Tr. 485). February, 2016 records note that Plaintiff was shoveling snow (Tr. 589). May, 2016 records state that Plaintiff's knee condition did not bother him until he played golf (Tr. 524, 550). Contrary to his claim that he experienced difficulty sitting for extended periods, Plaintiff testified that he was able to make multiple car trips to Colorado (Tr. 47). Aside from the periods following a work or sport-related injury, Plaintiff has not shown significant muscle weakness with sensory or reflex loss. His ability to drive, golf, shovel snow, and work part-time during the relevant period undermines his claim that the severity of his symptoms equaled Listing 1.04A. *See Bukowski* at *9 (the plaintiff's ability to "clean, shop, cook, take public transportation, pay bills, [and] care for herself" stood at odds with her claim that she medically equaled a listed impairment). Because Plaintiff cannot make a plausible showing that his condition medically equals Listing 1.04A or that a remand would result in a different Step Three determination, a remand is not warranted. *Rabbers v. Commissioner Social Sec. Admin.*, 582 F.3d 647, 658 (6th Cir. 2009)(harmless error analysis applied where upon remand, the ALJ "would have reached the same conclusion at step three").

**B.  The RFC**

In his second argument, Plaintiff disputes the RFC for a range of light work, arguing that the evidence of record stands at odds with the ALJ's finding. *Plaintiff's Brief* at 21-26. He argues that the ALJ failed to consider his limitations brought about by sleep disturbances. *Id.* at 22.  He argues that "the record is replete with evidence of continuing severe pain and dysfunction."  *Id.* at 24.  Plaintiff also contends that psychological limitations were not included in the RFC. *Id.* at 26-28.

An RFC describes an individual's residual abilities. *Howard v. Commissioner of Social Security*, 276 F.3d 235, 239 (6th Cir. 2002). The "RFC is to be an 'assessment of [a claimant's] remaining capacity for work' once her limitations have been taken into account" *Id.* (*citing* 20 C.F.R. § 416.945). In determining a claimant's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. §§ 404.1545(a)(1); 416.945 (RFC must be based on all "relevant evidence").  In crafting the RFC, the ALJ must consider the alleged physical, mental, and environmental restrictions. §§ 404.1545(b-d); 416.945; SSR 96-8p, 1996 WL 374184, at *6 (June 2, 1996).  However, an ALJ is permitted to draw from multiple medical sources in whole or part in crafting the RFC. *Rudd v. Commissioner of Social Security*, 531 F. App'x 719, 728 (6th Cir. September 5, 2013); SSR 96-8p at *2.

**1.  The Physical RFC**

Contrary to Plaintiff's claim, the RFC crafted by the ALJ is well supported and

explained (Tr. 21).  The ALJ noted that he considered the allegations of limitation "in the light most favorable" to Plaintiff (Tr. 22).  Based on Plaintiff's allegations, he limited him to occasional bilateral overhead reaching and frequent handling and fingering with the right hand (Tr. 21).  The ALJ restricted him to occasionally use of ramps and stairs and a preclusion on the use of ladders, ramps, or scaffolds, despite the treating records showing that Plaintiff power-washed while standing on a ladder as of May, 2009 (Tr. 21, 295).  The ALJ noted that the RFC was "not based upon" Plaintiff being "pain free, but rather . . . his ability to perform work activities on a sustained basis despite limitations . . . ." (Tr. 22).  He noted that the MRIs of the cervical and lumbar spine reflected some level of abnormality but observed that Plaintiff experienced good results from the conservative treatment of steroid injections (Tr. 22).  The ALJ noted that despite reports of back pain, Plaintiff was able to take "a three-day golf outing in the northern part of the state, drove to Colorado and back, and installed carpet during the relevant time period" (Tr. 22).

While Plaintiff cites records showing some degree of intermittent neck, back, and knee pain,  the treating records show that the exacerbation of symptoms occurred repeatedly where Plaintiff was engaged in activities exceeding the exertionally light RFC crafted by the ALJ: In July, 2008, treatment after a golf injury (Tr. 331); July, 2009, injury while power-washing on a ladder (Tr. 295); October, 2009, left elbow swelling after hitting another hockey player (Tr. 373);  January, 2010, right hand swelling and a fractured finger after getting in a fight (Tr. 368); June, 2015, right leg weakness while working as a "clean-up

man" at a store/installing carpeting (Tr. 485, 490); and May, 2016 injury while playing golf (Tr. 524, 550).

Plaintiff also argues that the ALJ erred by failing to account for limitations resulting from sleep apnea. He disputes the ALJ's finding that the ability to drive back and forth from Colorado undermined the disability claim, noting that the trip "aggravated his symptoms [of] insomnia, such that he slept only 3 of 36 hours." *Plaintiff's Brief* at 25 (*citing* Tr. 611). However, it is unclear from the records whether the lack of sleep was attributable to sleep apnea or the desire to make the long trip in as short a time possible (Tr. 611). Moreover, Plaintiff's ability to make the long car trip (even assuming that he made periodic stops) undermines his testimony that he was unable to sit for more than 20 minutes at a stretch (Tr. 42). While the records note that Plaintiff was encouraged to use a CPAP machine, his chief reason for seeking treatment following the long car trip was a headache and coughing (Tr. 611). It bears repeating that while Plaintiff alleged significant limitation due to sleep impairment, the condition did not prevent him from engaging in activities (including part-time work) well exceeding the limitations set for in the RFC. Notably, Plaintiff's alleged onset of disability date coincided with the month that he stopped working because his plant was shut down rather than a medical event (Tr. 36). Because the physical RFC was supported by substantial evidence, it should remain undisturbed.

-24-

## 2. The Mental RFC

The ALJ's finding that Plaintiff did not experience more than mild psychological limitation is also well supported by the record (Tr. 19). The ALJ noted that Plaintiff was able to drive, handle his finances, shop, interact with others, and maintain adequate concentration (Tr. 19). He noted that while Plaintiff testified that he needed reminders to shower, he engaged in a wide range of activities without difficulty (Tr. 19). The ALJ accorded "great weight" to psychologist Jeter's consultative finding that Plaintiff did not experience difficulty in comprehension or carrying out simple or complex tasks and Dr. Schirado's non-examining finding that the mental limitations were not severe (Tr. 22-23).

Plaintiff's claim that the ALJ misinterpreted the consultative and non-examining findings is not well taken. While he claims that Dr. Schirado actually found that the conditions of depression and substance abuse were "severe" impairments, the categorization of these impairments as severe on one page of the record is clearly scrivener's error (Tr. 73). The "severe" finding is followed by Dr. Schirado's conclusion that Plaintiff experienced only mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace (consistent with a non-severe impairment) accompanied by a notation that the mental limitations were non-severe (Tr. 74). While Plaintiff also faults the ALJ for according "great weight" to psychologist Jeter's findings without acknowledging Jeter's note that Plaintiff required "extra time and rest periods," Jeter's remark appears to be based on Plaintiff's own allegations regarding his activities of daily living rather than the results

-25-

of a physical assessment. Indeed, Jeter's psychological assessment, (noting that Plaintiff was already working 12 hours a week) concluded by stating that Plaintiff was capable of both simple and complex tasks (Tr. 471, 473). While Plaintiff points to social worker Callard-Moore's July, 2016 finding that he was psychologically incapable of any work, the ALJ permissibly rejected the finding of extreme limitation on the basis that (1) it was contradicted by Plaintiff's ability to "travel, golf, install carpet, and perform activities of daily living and, (2) Plaintiff had "only a short treatment relationship" with Callard-Moore (Tr. 23). My own review of the record shows that Plaintiff's treatment with Callard-Moore, beginning in April, 2016, lasted for three months at most and addressed mostly family-related stressors (Tr. 537). Notably, Plaintiff reported to Dr. Rosella in May, 2016 that his family situation had improved (Tr. 578).

Because the RFC composed by the ALJ was amply supported by the record, including his findings that the psychological limitations were mild, a remand on this basis is not warranted.

### C. The Report by Plaintiff's Brother

In his third argument, Plaintiff argues that the failure to mention the report of his brother, Kevin Patrick O'Brien, requires a remand for further proceedings. *Plaintiff's Brief* at 28-29.

Under SSR 06-3p, the ALJ is required to consider "'non-medical sources' such as spouses, other relatives, friends, employers, and neighbors" in making the administrative

determination.  2006 WL 2329939, at *3 (August 9, 2006); 20 C.F.R. 404.1513(d)(4).  In assessing the non-medical sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.* at 6.  However, SSR 06-03p makes a distinction between "opinions" by individuals who evaluated a claimant in their professional capacity and "evidence" from those "who have not seen the individual in a professional capacity in connection with their impairments" *Id.*  For the former, "the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their *professional* capacity." *Id.* (Emphasis added).  For the latter (in regard to "evidence" by non-professional sources) the Ruling states only that "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."  SSR 06-3p cannot be read to require that evidence by non-professionals must be discussed (*i.e.,* "reflected") in the administrative findings.  Because Plaintiff's brother made his report in his capacity as a family member and not as either as a medical or non-medical profession, the ALJ's statement that he considered *all* of the evidence is sufficient to show that he took into account the statement by Plaintiff's brother (Tr. 16).

Practically speaking, the statement by Plaintiff's brother that Plaintiff's lifestyle had been "destroy[ed]" by "lack of sleep due to pain" and that Plaintiff often napped in the

morning is undermined by Plaintiff's own testimony that he took one "two-hour" power nap each afternoon (Tr. 49). Although the brother stated in April, 2016 that Plaintiff did not shovel snow (Tr. 190), Plaintiff was still shoveling snow as of February, 2016 (Tr. 589). The brother's claim that Plaintiff did not take care of pets contradicts Plaintiff's statement to psychologist Jeter that he was able to take care of his dog (Tr. 189, 470). While Plaintiff testified that he had little knowledge of computers, his brother stated that Plaintiff was able to shop both in stores and by computer (Tr. 191). Aside from the discrepancies between the two accounts, Plaintiff's ability to work part-time, golf, travel, and play hockey undermine the brother's claim that Plaintiff's life has been destroyed by pain and sleep disturbances. As such, the fact that the ALJ declined to discuss the statements by Plaintiff's brother do not provide grounds for remand.

### D. The Step Four Determination

In his last argument, Plaintiff disputes the ALJ's determination that he was capable of performing his past relevant work as a shipping and receiving clerk, assembler, and inspector. *Plaintiff's Brief* at 30-31. He argues, in effect, that the VE's testimony that he was capable of his past work was given in response to a hypothetical question which did not contain all of his relevant limitations. *Id.*

Plaintiff's argument that he is unable to perform his past relevant work pertains to the ALJ's findings at Step Four of the sequential analysis. At Step Four, a three-prong test must be met in order to find that a claimant can return to her past relevant work: "(1) a finding of

fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job; and (3) a finding of fact that the individual's RFC permits a return to that past job." SSR 82–62, 1982 WL 31386, *2 (1982).  The Step Four determination can be supported by the finding that claimant can perform his past relevant work as "actually performed," or, "as generally required by employers throughout the national economy." SSR 82–61, 1982 WL 31387, *2 (1982).  The claimant "bears the burden of proving the existence and severity of limitations caused by [the] impairments and the fact that [he] is precluded from performing h[is] past relevant work" either as previously performed or as generally required in the national economy. *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir. 2003).

Citing the VE's testimony, the ALJ determined that the hypothetical restrictions posed at the hearing would not preclude Plaintiff's past relevant work  as actually performed or as generally performed in the national economy (Tr. 23, 58).   The RFC found in the administrative opinion mirrors those restrictions posed to the VE (Tr. 21).  As discussed at length above, substantial evidence amply supports the choice of limitations found in the RFC. Plaintiff's claim that the hypothetical question ought to have contained more stringent restrictions fails for identical reasons.   *See Stanley v. Secretary of HHS*, 39 F.3d 115, 118–119 (6th Cir. 1994)(ALJ not obliged to credit rejected allegations of limitation in question to VE or by extension, in the ultimate RFC).

Substantial evidence and even a preponderance of the evidence strongly supports the ALJ's non-disability determination.  Notwithstanding the presence of evidence supporting

the opposite conclusion, courts "must defer to an agency's decision . .  . . . 'so long as substantial evidence supports the conclusion reached by the ALJ.'" *Jones*, 336 F.3d at 475 (6th Cir. 2003)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   Because the determination that Plaintiff was not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above,  I recommend that Defendant's motion for summary judgment [Docket #13] be GRANTED and that Plaintiff's motion for summary judgment [Docket #10] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any

objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

Dated: July 30, 2019                              s/R. Steven Whalen
                                                   R. STEVEN WHALEN
                                                   UNITED STATES MAGISTRATE JUDGE

---

## CERTIFICATE OF SERVICE

I hereby certify on July 30, 2019 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 30, 2019.

                                                   s/Carolyn M. Ciesla
                                                   Case Manager for the
                                                   Honorable R. Steven Whalen